Nott, Ch. J.,
dissenting:
It is a universal principle and practice in commerce that the consignee must be ready to receive the freight. All contracts of affreightment must be construed in the light of that general principle, and if the charterer wishes. to avoid it he must secure exemption by an express provision in his agreement.
In the preceding case of Moore & Co. the contract was specific to deliver at the wharf. It bound the shipper to *614 unload the coal at the wharf, and reciprocally bound the consignees to receive- it there. The master desired to deliver, and the. consignees were ready and willing to receive. Neither party was in fault. The real defense in that case was that the common intention of both was thwarted by the interposition of a third party — by the harbor master preventing the vessel from coming to the place of delivery. I am inclined to think that it is a good defense, as much so as if the local authorities had precluded the vessel from entering the port.
But in this case the contract was not to deliver at the wharf, but to deliver from the “vessel’s tackles.” The contract was broader than that in the other case. There the vessel was hound to deliver, and the consignees to receive, at one designated place — the wharf. Hero the vessel was bound to deliver from her tackles as the consignees might direct — on the wharf, on a ship of war, on an army transport, on a lighter. And reciprocally the consignees were bound to be read}'- to receive the cargo when the ship should arrive, except as otherwise provided in the contract. If the defendants intended that the coal should be delivered at the wharf, and nowhere else, they should have so provided in this contract as in the other. Thej' having an unrestricted right to have the coal delivered at the wharf, on another vessel, or in a lighter, laid upon them a reciprocal obligation to be ready to receive it in some of these ways; and the claimants, when they entered into the contract, had a right to expect that they would be ready. The defendants had no more right to keep the vessel waiting at her cost for a wharf than to have kept her waiting for a ship of war or an army transport on board of which they had intended to unload the coal. It is said that there were no public lighters in the port; but it was not the claimants on whom the obligation was to provide lighters. .It is said that the defendants had no lighters there of their own; but the claimants did not know that when they entered into the contract, and the defendants did. For the defendants to say that they had neglected to provide lighters is not equivalent to saying that they were prevented by the act of God. In the other suit the vessel was bound to get to the wharf;, in this, all that the vessel was bound to do was to be ready-to deliver from her tackles.
*615 Much was said on the argument in the other case about the “custom of the port” and “usage.” But that has no application here, for it referred to vessels getting to the wharves. There was no “ usage,” and there could have been none which would have prevented a vessel from unloading onto a lighter or another vessel. It appears in the case of Moore & Co. that that was done; 11,330 tons of coal were delivered in the harbor aboard the steamship Arizona.
My conclusion is that the quartermaster’s compelling these vessels to wait for a wharf and neglecting to provide lighters or other vessels on which the coal could have been unloaded constituted demurrage, for which the defendants are liable.